[Cite as *Wild v. Midwest Gift Assn., Inc.*, 2018-Ohio-1527.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Marcia Wild, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 17AP-508 |
| v. | : | (C.P.C. No. 15CV-1796) |
| Midwest Gift Association, Inc., et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on April 19, 2018

**On brief:** *Scott Elliot Smith, L.P.A.*, *Scott E. Smith*, and *Nickolas D. Owen*, for appellant. **Argued:** *William Mann.*

**On brief:** *Lane Alton*, *Michael J. Kelley*, and *Eric S. Bravo*, for appellees, Gennari & Co., and Kathy Gennari. **Argued:** *Michael J. Kelley.*

**On brief:** *Curry, Roby & Mulvey Co., LLC*, *Bruce A. Curry*, and *Trent M. Thacker*, for appellees, Midwest Gift Association, Inc., and The Columbus Marketplace. **Argued:** *Trent M. Thacker.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Marcia Wild, appeals two decisions of the Franklin County Court of Common Pleas issued on March 30 and June 19, 2017, which together resulted in granting summary judgment to all defendants in the case and denying her motions for partial summary judgment. Because the record shows that, when viewing the evidence before the trial court in a light most favorable to Wild, reasonable minds could differ on facts material to Wild proving her case, we reverse the trial court's decision granting summary judgment to all defendants-appellees.

## I.  FACTS AND PROCEDURAL POSTURE

{¶ 2}   At the times relevant to this case, Midwest Gift Association, Inc. ("Midwest") was an association of gift industry vendor representatives that promoted products and took orders from store proprietors and buyers for retail sale to the public.  (Wild Dep. at 10-12, filed Feb. 9, 2016.)  Midwest operated from a permanent location, 7001 Discovery Blvd., Dublin, OH 43017, an approximately 65,000-square-foot building, which Midwest leased.  (Feb. 27, 2015 Compl. at ¶ 4; May 1, 2015 Midwest Answer at ¶ 3.)  The location was known as The Columbus Marketplace.  (Compl. at ¶ 4; Midwest Answer at ¶ 3.)  Each member of Midwest that desired a show booth subleased that area from Midwest, and it and its members operated industry shows at The Columbus Marketplace to demonstrate and sell their various product lines.  (Wild Dep. at 13.)  Mary Kathleen[1] ("Kathy") Gennari/Gennari & Co. (collectively, "Gennari") and Wild (who does business through an entity not relevant to this action), were two such sub lessees.  (Midwest Answer at ¶ 2.)

{¶ 3}   The Columbus Marketplace was a large warehouse-like structure that was subdivided by partitions that did not reach all the way to the ceiling.  This gave Midwest's members operating booths or show areas for store buyers to view their product lines.  (Jan. 12, 2016 Gennari Dep. at 14-15, filed Mar 7, 2016.)  Gennari and Wild's show areas were each toward the front of the building and were adjacent to one another on the South side of an East/West central aisle.  (Ex. 1, Gennari Dep. (see A17 & A18).)  The overhead lights for each of their show areas, and also for the entire front portion of the building, were controlled by breaker box switches on the East wall of a cage-enclosed utility room found in the North/East corner of Gennari's show area.  (Gennari Dep. at 17-19; Exs. 1, 3, 9.)

{¶ 4}   The utility room, as initially constructed, had only one solid wall, the East wall. Some breaker switches were mounted on the north boundary of the space.  The West and South borders to the space were bounded by chain-link fence and there was a gate within the South chain-link fence to permit access to the space.  (Exs. 1-4, 14, Gennari Dep.) The East wall was solid from floor to ceiling and permitted no direct or ambient light. Before the date and time of the events giving rise to this lawsuit, that is, when Wild fell, Gennari displayed materials and furniture against the chain-link Western and Southern

---

[1] The record at times refers to her as Mary Katherine Gennari.  (Gennari Dep. at 1.)  But when she introduced herself at her deposition she self-reported her name as Mary Kathleen Gennari.  *Id.* at 7.  As she is in the best position to know her own name, we shall assume that is the correct name.

fencing, not blocking the gate to her showroom located at the South wall. (Gennari Dep. at 60-61, 75-76; Exs. 2, 14.) Previous to the date when Wild fell, the then director of Midwest procured the services of an artist to make the subject utility room more "inviting." (Gennari Dep. at 63-66.) This resulted in cardboard being used to cover electrical equipment on the North border of the room and on the chain-link Western fencing. (Gennari Dep. at 66-81; Exs. 2, 4, 18.) With Gennari's displays to the South and the cardboard to the North and West, ambient light could enter the space only at the South gate and over the top of the cardboard from the North and the West. The cardboard was approximately eight to ten feet high. (Gennari Dep. at 81-82.) When the building's overhead lights were off, there was some emergency lighting in the back of the building, and some natural light could enter the building through East-facing front windows situated to the South of the gate to the Gennari showroom. *Id.* at 52-57; 87-94; Ex. 1.

{¶ 5} On the morning of April 5, 2013, Wild arrived at The Columbus Marketplace with a buyer for a local shop. (Wild Dep. at 10, 42.) Although some other people were present at The Columbus Marketplace, they were in the back of the building and the lights in the front area were off. (Izworski Dep. at 8, 13-14, filed Feb. 9, 2016.) Wild entered the utility room through Gennari's show space for the purpose of turning on the lights. (Wild Dep. at 44, 59.) As a result of either tripping over or treading upon boxes within the dark utility room, she fell, suffering injuries to her knee and shoulder that required multiple surgeries. *Id.* at 67, 88, 91-92.

{¶ 6} Wild sued Gennari and Midwest on February 27, 2015 for damages for her injuries. Gennari and Midwest moved for summary judgment against Wild in February of the following year. (Feb. 9, 2016 Midwest Mot. for Summ. Jgmt.; Feb. 18, 2016 Gennari Mot. for Summ. Jgmt.) Approximately one month later, Wild also filed motions for partial summary judgment. (Mar. 9, 2016 Wild Mot. for Summ. Jgmt.) In connection with the summary judgment motions, the parties filed four depositions with the court, accompanied by a unified set of 34 exhibits.[2] The deposition transcripts were for the depositions of Marcia Wild (the injured party), Kathy Gennari (a defendant), Georgette Izworski (a fellow member of Midwest who was at The Columbus Marketplace when Wild fell), and Susan Wilson (a customer of Wild's who was at The Columbus Marketplace when Wild fell).

---

[2] Exhibits are numbered 1-35 but there is no 28. (Gennari Dep. at 5.)

{¶ 7}  Wild testified that on April 5, 2013, she was at The Columbus Marketplace with a customer.  (Wild Dep. at 10, 42.)  Wild said she told her customer, Wilson, to wait while she turned the lights on.  *Id.*  As was necessary and normal, she went through Gennari's space to the utility room where the panel box was located.  *Id.* at 44, 59.  She confirmed that there was no artificial light in the caged-in utility room and only a little light coming in above the cardboard walls near the ceiling.  *Id.* at 51, 56-57.  Once she entered the darkened utility room she tripped on something that she later found out were heavy boxes of carpet samples and catalogs.  *Id.* at 67.  She testified that she believed the boxes belonged to Gennari based on their contents, which were samples of the lines Gennari represented.  *Id.* at 70.  She testified that she did not see the boxes as she walked through the darkened utility room and that she did not believe she would have seen them if she had looked down at the floor because they would have "blended in" with the floor in the dim light and she was not expecting to see an obstruction in the doorway to the room.  *Id.* at 80-82.  She admitted that she did not personally know how the boxes came to be on the floor where she tripped over them and, although the utility room entrance was within Gennari's show area, many people had access to the room.  *Id.* at 86, 119-20.

{¶ 8}  Izworski testified that on April 5, 2013, she and her husband were at their stall in the rear portion of The Columbus Marketplace when someone came into their shop area yelling that Wild needed help.  (Izworski Dep. at 8, 13-14.)  They rushed to the utility room in Gennari's showroom and initially could not discern Wild among the boxes in the darkened room.  *Id.* at 15-16.  Izworski testified that boxes were scattered around where Wild lay; the boxes appeared to contain catalogues and rug samples.  *Id.* at 19.  Izworski testified that she observed a Gennari label on the boxes and recognized products from vendors that Gennari represented.  *Id.* at 19-20.  She testified that she cleared away the boxes, approximately 14 of them, to make a path for the rescue squad to collect Wild and that she put the boxes outside of the utility room in Gennari's space.  *Id.* at 30, 65-74.  Before the squad arrived, Wild told Izworski that she went in to turn on the lights and tripped over the boxes.  *Id.* at 32-33.  Wild's fall took place around 10:30 or 11:00 a.m.  *Id.* at 37.  When Izworski arrived at home after the accident, she telephoned Tim Dolan, another member of Midwest who was then the president of Midwest, and told him what had occurred.  *Id.* at 40.  His response was, "Damn it.  We just had it inspected, and I told Gennaris [sic] that

area had to be clear." *Id.* at 41. Izworski was explicit that she and Dolan were talking about the caged utility room and that she informed him that the area was not clear and that she had personally carried out the boxes that were surrounding Wild on the floor. *Id.* Izworski did not know if it was Gennari or her husband who had placed the boxes in the utility room. *Id.* at 90-92. But she testified that Gennari regularly stored items in the utility room. *Id.* at 85, 91-92.

{¶ 9} Wilson, Wild's customer, testified that she met Wild at The Columbus Marketplace in April 2013 to look at some pieces Wilson was thinking of buying on behalf of her employer, a local gift shop. (Wilson Dep. at 8, 12, filed Mar. 23, 2016.) Wilson testified that when they entered The Columbus Marketplace building there were some dim lights on near the back where a janitor and some other people were working, but none were on near the front. *Id.* at 15-16. Wild excused herself to go turn on the lights and told Wilson not to follow because the area was sometimes messy and she did not want Wilson to fall. *Id.* at 13-14. Wilson said that Wild told her that whoever it was who put the things in the electric room had received a warning about cleaning it up. *Id.* at 18. Wilson testified more than once that Wild had said that there were boxes and that she had to stand on something to reach the switch. *Id.* at 19-21, 37-38, 62. However, Wilson admitted that that she may have inferred that the switch was located high up. *Id.* at 50-54; Ex. 3, Wilson Dep. She testified that she heard a yell and a moan from Wild and went to check on her. (Wilson Dep. at 20.) She said that when she went to investigate she actually walked into a crate or box herself before her eyes became acclimated to the dark, but she did not fall. *Id.* at 21-24. Wilson testified that as her eyes became accustomed to the dark she could see Wild's shoes and a large number boxes in disarray around her. *Id.* at 25, 58-59. She ran and got help from Izworski and her husband who were working at the back of the building. *Id.* at 31. When they came to help and turned on the lights, Wilson was able to see that the boxes contained sample books. *Id.* at 33-34. She did not look at the labels on the boxes but said most seemed to be open. *Id.* at 35.

{¶ 10} Gennari testified that she is the sole-proprietor of Gennari & Co. and that, at the time of the fall, she leased space at The Columbus Marketplace. (Gennari Dep. at 11-15, 20.) Gennari acknowledged that the caged utility room (where Wild fell) was located within her display area and that it was necessary to go into the utility room to turn on the lights

for the front of the building, which also included Wild's space. *Id.* at 17-19. Although Gennari maintained that there was enough ambient light to see in the utility room, she stated that she used a flashlight whenever she went in there. *Id.* at 54-57, 87-90. She also admitted that the former director of Midwest had engaged someone to put up coverings around the caged area to make it more inviting and that the artist had put cardboard along the North and West walls of the caged area. *Id.* at 63-70, 77-78, 80-81. Gennari explained that her display materials, are stacked against the West wall. *Id.* at 75-76; *see also* Ex. 2. As a consequence of these things, the room became darker than originally constructed and light only entered the room over the top of the cardboard and stacked materials. (Gennari Dep. at 90-94.)

{¶ 11} Gennari acknowledged that, although on-site storage facilities were available to rent, Gennari stored items in the electrical utility room and believed she was permitted to store things on the floor as long as such articles did not obstruct access to the area. *Id.* at 21-22, 111-13, 145-46, 183; Ex. 8. Gennari admitted that the boxes pictured on the floor of the utility room in exhibit No. 8 were hers but said she was not sure how her vacuum cleaner had gotten into the utility room. *Id.* at 113, 138; Ex. 8. She admitted she had been told by the fire department that she needed to leave an open path to the breaker. *Id.* at 51, 121. She also testified that the lease agreement between Midwest and the owner of the building, Discovery MC Investments, L.L.C. ("Discovery"), required that common areas be kept clear of obstructions. (Gennari Dep. at 99-105; Brittan Aff. Ex. Aiii at 32, Ex. 1, attached to Mar. 9, 2016 Wild Mot. for Summ. Jgmt.) She confessed that she had no reason to disbelieve Wild and Izworski about what was in the room on April 5, 2013, but testified that Wild should have looked where she was going. (Gennari Dep. at 115-22, 144.)

{¶ 12} Gennari acknowledged she received an e-mail from Julie Dakin (director of Midwest) shortly after Wild's accident:

> In a message dated 4/7/2013 3:07:19 P.M. Eastern Daylight Time, director@thecolumbusmarketplace.com writes:
>
> Hi Kathy and Joe [Gennari],
>
> I am going to send out an email to the membership but I wanted to let you know what happened last Friday late morning at the MarketPlace. Marcia Wild fell when she went to turn on the lights. She tripped over boxes that were on the floor. Unfortunately, she is in the hospital with a broken knee cap and

> dislocated shoulder. I have talked to her and she is OK. She will hopefully get out of the hospital tomorrow or Tuesday and might have to go to a rehab center for a while. She is still waiting to hear. The MarketPlace has insurance and I have given Marcia all the details. We just need to get those boxes out of there please. Let me know if you have any questions.
>
> Thanks,
>
> Julie [Dakin]

(Ex. 22 at 2-3, Gennari Dep.) Gennari admitted that she responded in relevant part as follows:

> Dear Julie,
>
> We are so upset! We haven't been in Columbus since February, so I am not sure which boxes were in the way. Was this in our office or was it by the lights, in the caged area? Either way, we are responsible for the boxes being there, and I am so sorry. She must be in so much pain.
>
> What can we do?
>
> * * *
>
> Kathy [Gennari]

*Id.* at 2.

{¶ 13} However, at her deposition Gennari testified that her e-mail was inaccurate and that she was not responsible for Wild's fall. (Gennari Dep. at 115-16.) She asserted that her admission of responsibility was based on her incorrect belief that Wild had fallen in her sales area and not the common area of the utility closet. *Id.* at 179-80. Although she was not there on the day of the fall and had not been to The Columbus Marketplace since February, she stated that there was an open path to the breaker because her sales representatives, who were present for a show in March, had told her they left an open path to the breaker. *Id.* at 104-05, 124-25. Yet she distinguished an "open path" from a clear path, stating:

> I don't think just there was a clear path. I think it was an open path, which is different. A path can be small.

> I think that the room was open and there was an open path,
> because that is what we were instructed to do by the fire chief
> that came and talked to us.

*Id.* at 121. She also testified that a number of boxes were delivered following the March show and that people could have been moving stuff without her knowledge. *Id.* at 148, 153-54. However, she admitted that only Gennari-associated people would have opened the boxes as the obstructing boxes pictured in exhibits Nos. 5 through 8 were. *Id.* at 148, 152-53; Exs. 5-8.

{¶ 14} In addition to the deposition testimony and exhibits, Wild submitted three affidavits with exhibits. One affidavit was from a designee of Discovery, the company which owned 7001 Discovery Blvd. and from which Midwest leased the building. (Brittan Aff. at ¶ 3-5.) This designee attested that Midwest did not seek or obtain Discovery's permission to modify the walls of the electrical utility room in the manner that it did. *Id.* at ¶ 11, 13-14. This affiant also noted that the lease terms prohibit obstruction of common areas (which the electrical room was) and operate to the benefit of all sub lessees. *Id.* at ¶ 6-7, 10. Another affidavit was from Wild, herself, essentially providing the same testimony that she gave during her deposition. (Wild Aff. in passim, Ex. 2, attached to Mar. 9, 2016 Wild Mot. for Summ. Jgmt.) The final affidavit was from a registered architect who is employed as a forensic architect. (Martin Aff. in passim, Ex. 3, attached to Mar. 9, 2016 Wild Mot. for Summ. Jgmt.) After reviewing photographs of the scene and Wild's affidavit, the forensic architect opined, in relevant part:

> The failure of Midwest * * * and Gennari * * * to maintain effective light levels in the electrical equipment enclosure violated the standard of care for pedestrian safety, and was a cause of Wild's fall and injury.
>
> * * *
>
> The failure of Midwest * * * and Gennari * * * to store boxes and other merchandise outside of the electrical equipment enclosure as required by code violated the standard of care for pedestrian safety, and was a cause of Wild's fall and injury.

*Id.* at ¶ 26, 31.

{¶ 15} On April 15, 2016, the trial court granted Midwest and Gennari summary judgment. It reasoned that Wild's claims essentially consisted of a "slip and fall action" and

that the basic facts were not in dispute.  (Apr. 15, 2016 Decision at 1.)  It found that the boxes were an open and obvious hazard because a "reasonable person making a reasonable inspection would have seen the boxes."  *Id.* at 6.  In light of its conclusion that the boxes were open and obvious, the trial court reasoned that no duty was owed to Wild and granted summary judgment to Midwest and Gennari.  *Id.*

{¶ 16}  Finding that the trial court "did not seriously consider" a number of factual nuances in this case that raised genuine questions as to whether the boxes were open and obvious, this Court reversed.  *Wild v. Midwest Gift Assn.*, 10th Dist. No. 16AP-367, 2016-Ohio-8351, ¶ 10-12.

{¶ 17}  On remand, Midwest once again moved for summary judgment and Wild once again moved for partial summary judgment.  (Jan. 11, 2017 Midwest Mot. for Summ. Jgmt.; Jan. 25, 2017 Wild Mot. for Summ. Jgmt.)  Midwest did not introduce any new evidentiary materials.  Despite this, on March 30, 2017, the trial court granted Midwest's motion, concluding as follows:

> In the present matter, after reviewing the record in this matter, it is clear to the Court that Plaintiff's claims against Defendants fail. There is no evidence that Defendants owned or placed the boxes upon which Plaintiff tripped and fell. There is no evidence that Defendants had actual notice of the boxes upon which Plaintiff tripped and fell. Finally, there is no evidence that Defendants had constructive notice of the boxes upon which Plaintiff tripped and fell. All evidence that Plaintiff does have to show Defendants had any knowledge of the boxes is pure speculation or hearsay. As such, the Court must grant Summary Judgment in Defendants' favor.

(Mar. 30, 2017 Decision at 3.)

{¶ 18}  Five days after the decision in favor of Midwest, Gennari moved for summary judgment and attached an affidavit of Gennari swearing that neither she nor any of her representatives "placed any boxes or other property on the floor of the common area utility room in the path of Ms. Wild" and speculating that some other party having access to the utility room must have done so. (Gennari Aff. at ¶ 9, attached to Apr. 4, 2017 Gennari Mot. for Summ. Jgmt.)  To her response in opposition, Wild attached the affidavit of Discovery's property manager. (Looney Aff., Ex. 1, attached to May 3, 2017 Wild Memo in Opp.)  The property manager swore that prior to Wild's accident, he instructed Midwest's director, Dakin, to have boxes and products removed from the common area utility room.  *Id.* at ¶ 5.

Approximately one week later, on May 10, 2017, Wild moved for partial summary judgment against Gennari and Midwest and also requested the trial court reconsider its March 30, 2017 grant of summary judgment to Midwest. (May 10, 2017 Wild Mot. to Recons. & for Summ. Jgmt.)

{¶ 19} After briefing by all parties, the trial court, on June 19, 2017, entered a decision granting Gennari summary judgment and denying reconsideration. It reasoned as follows:

> In the present case, Plaintiff tripped and fell over boxes owned by the Gennari Defendants that were placed in a utility room. The Court has previously held that Defendants, Midwest Gift Association and The Columbus Marketplace, neither placed the boxes in the utility room nor did they have knowledge of the boxes in the utility room. Therefore, the Court granted Summary Judgment in Defendants, Midwest Gift Association and The Columbus Marketplace, favor. The question now before the Court is: Did the Gennari Defendants place the boxes in the utility room or have knowledge of the boxes in the utility room? If the evidence shows that the Gennari Defendants did one of the above two things, then they will have breached the duty of ordinary care owed to Plaintiff.
>
> Upon review of the evidence, it becomes clear that the Gennari Defendants neither placed the boxes in the utility room nor did they have knowledge of the boxes in the utility room. The last time the Gennari Defendants were at The Columbus Marketplace before Plaintiff's accident was March 19, 2013. It is undisputed that the boxes were not in the utility room at this time. Plaintiff's accident occurred on April 5, 2013. It is undisputed that neither the Gennari Defendants nor any representatives of the Gennari Defendants were at The Columbus Marketplace during this time. Therefore, the evidence shows that the Gennari Defendants were not responsible for placing the boxes in the utility room. Furthermore, there is no evidence to show that the Gennari Defendants knew that the boxes were in the utility room before Plaintiff's accident. In fact, there is no real evidence in this matter to show who actually placed the boxes in the utility room. While the Gennari Defendants may have owned the boxes upon which Plaintiff fell, there is nothing to show that they breached the duty of ordinary care in this matter. As such, Summary Judgment must be awarded to the Gennari Defendants.

(June 19, 2017 Decision at 3-4.)

{¶ 20} Wild now appeals both the March 30 and June 19, 2017 decisions of the trial court granting summary judgment to the defendants, Midwest and Gennari.

## II. ASSIGNMENTS OF ERROR

{¶ 21} Wild assigns two errors for review:

> [1.] THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY GRANTING SUMMARY JUDGMENT UPON PLAINTIFF-APPELLANT'S PREMISES LIABILITY CLAIM AGAINST APPELLEE COLUMBUS MARKETPLACE.
>
> [2.] THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY GRANTING SUMMARY JUDGMENT UPON PLAINTIFF-APPELLANT'S PREMISES LIABILITY CLAIM AGAINST APPELLEE GENNARI.

## III.  DISCUSSION

{¶ 22} Ohio Civ.R. 56(C) provides that:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Supreme Court of Ohio has explained:

> Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 Ohio Op. 3d 466, 364 N.E.2d 267. The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 1996 Ohio 107, 662 N.E.2d 264.

Byrd v. Smith, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10; see also, e.g., Esber Bev. Co. v. Labatt United States Operating Co., L.L.C., 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

{¶ 23} In deciding summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Byrd* at ¶ 25.  When reviewing a trial court's decision on summary judgment, our review is de novo and we therefore apply the same standards as

the trial court. *Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540, 2011-Ohio-1818, ¶ 12; *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.

### A. First Assignment of Error – Whether the Trial Court Erred in Granting Summary Judgment to Midwest and Failing to Reconsider that Decision

{¶ 24} In granting summary judgment to Midwest, the trial court relied on its finding that there was "no evidence that Defendants had actual notice of the boxes upon which Plaintiff tripped and fell" and "no evidence that Defendants had constructive notice of the boxes upon which Plaintiff tripped and fell." (Mar. 30, 2017 Decision at 3.) But upon our de novo review of the record and when drawing "all favorable inferences" for Wild, there was evidence that Midwest had notice of the boxes. *Byrd* at ¶ 25. There is evidence in the record that, when Izworski arrived at home after the accident, she telephoned Dolan, then president of Midwest. Izworski stated that she told Dolan that Wild had tripped over boxes in the caged utility room and injured herself. *Id.* at 40-41. His response was, "Damn it. We just had it inspected, and I told Gennaris [sic] that area had to be clear." (Izworski Dep. at 41.) Gennari herself, moreover, admitted that she had been told by the fire department during an inspection that she had to leave a clear path to the breaker. (Gennari Dep. at 51, 121.) It is also worth noting that Gennari admitted that the director of Midwest engaged someone to cover the walls of the electrical room with light-blocking cardboard, which rendered the boxes more difficult to see. *Id.* at 63-70, 77-78, 80-81, 90-94. These admissions are sufficient to permit an inference that Midwest was informed, prior to the accident, that Gennari was placing materials in the darkened utility room in the path to the breaker.

{¶ 25} Moreover, after summary judgment was granted but before the trial court was asked to reconsider, Wild filed an affidavit of the property manager of 7001 Discovery Blvd. in which he swore that, prior to Wild's accident, he instructed Midwest's director, Dakin, to have boxes and products removed from the common area utility room. (Looney Aff. at ¶ 5.) From our review of the record, by the time Wild sought reconsideration of the trial court's summary judgment in favor of Midwest, there was even more evidence from which the trial court should have concluded (when properly drawing all inferences in favor of Wild) that there was a genuine issue of fact as to whether Midwest was on notice of the hazard created by the boxes stacked in the darkened utility room.

{¶ 26} The trial court explained its conclusion that there was "no evidence" that Midwest knew of the hazard by stating that, "[a]ll evidence that Plaintiff does have to show Defendants had any knowledge of the boxes is pure speculation or hearsay." (Mar. 30, 2017 Decision at 3.) The opinion does not indicate, and we cannot determine, what of the above-recounted items of evidence the trial court considered to be speculative or unreliable. But, to the extent it might have considered the statement of Midwest President Tim Dolan hearsay, we apply Ohio Rule of Evidence 801(D)(2), applicable to "**Statements which are not hearsay**":

> **Admission by party-opponent.** The statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity, or * * * (c) a statement by a person authorized by the party to make a statement concerning the subject, or (d) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship * * *.

(Emphasis sic.) Evid.R. 801(D)(2)(a), (c) and (d). A statement by an organization's president, when introduced against the organization, is a statement by a party opponent and therefore not hearsay. *See, e.g., IPI, Inc. v. Monaghan,* 6th Dist. No. L-07-1101, 2008-Ohio-975, ¶ 37; *Thornton v. Parker,* 100 Ohio App.3d 743, 752-54 (10th Dist.1995).

{¶ 27} There is evidence to suggest that Midwest was aware of the boxes and the hazard posed by their placement in a dimly lit room. Midwest never produced a deponent or affiant who attested that Midwest had no awareness of the condition. Midwest was not entitled to summary judgment. Wild's first assignment of error is sustained and we decline to consider the trial court's refusal to reconsider summary judgment for Midwest, since Wild's motion to reconsider is now moot.

### B. Second Assignment of Error – Whether the Trial Court Erred in Granting Summary Judgment to Gennari

{¶ 28} In granting summary judgment to Gennari the trial court made the following factual findings:

> [T]he Gennari Defendants neither placed the boxes in the utility room nor did they have knowledge of the boxes in the utility room. The last time the Gennari Defendants were at The Columbus Marketplace before Plaintiff's accident was March 19, 2013. It is undisputed that the boxes were not in the utility room at this time. Plaintiff's accident occurred on April 5, 2013.

> It is undisputed that neither the Gennari Defendants nor any representatives of the Gennari Defendants were at The Columbus Marketplace during this time. Therefore, the evidence shows that the Gennari Defendants were not responsible for placing the boxes in the utility room. Furthermore, there is no evidence to show that the Gennari Defendants knew that the boxes were in the utility room before Plaintiff's accident. In fact, there is no real evidence in this matter to show who actually placed the boxes in the utility room. While the Gennari Defendants may have owned the boxes upon which Plaintiff fell, there is nothing to show that they breached the duty of ordinary care in this matter.

(June 19, 2017 Decision at 3-4.)

{¶ 29} We cannot ignore evidence in the record that tends to show that Gennari was responsible for the boxes being in Wild's path. For example, upon hearing that Wild had sustained substantial knee and shoulder injuries after tripping over boxes while attempting to turn on the light, Gennari wrote:

> We haven't been in Columbus since February, so I am not sure which boxes were in the way. Was this in our office or <u>was it by the lights, in the caged area?</u> <u>Either way, we are responsible for the boxes being there</u>, and I am so sorry.

(Emphasis added.) (Ex. 22 at 2, Gennari Dep.). As a direct admission of responsibility by a party opponent, this evidence was admissible and should have been considered by the trial court. Evid.R. 801(D)(2)(a). Though Gennari later attempted to walk back her written statement in her deposition, it is up to a jury, not the trial court, to decide which is the more credible–her e-mail when she first found out, or her later retraction after she had been sued. (Gennari Dep. at 115-17.)

{¶ 30} In addition to the direct admission of responsibility, Gennari said a number of things during her deposition that, support a required inference in favor of Wild, the nonmoving party, that Gennari or agents of Gennari had placed the boxes in question in the darkened utility room. For example, Gennari acknowledged that she and her agents stored items in the electrical utility room and believed it was permitted to store things on the floor as long as such articles did not obstruct access to the area. *Id.* at 21-22, 111-13, 145-46, 183; Ex. 8. She twice admitted she had been told by the fire department that she needed to leave an open path to the breaker. *Id.* at 51, 121. She admitted that the boxes pictured on the floor of the utility room in exhibit No. 8 were hers. *Id.* at 113, 138; Ex. 8.

Although she testified that a number of boxes were delivered following the March show and that people could have been moving stuff without her knowledge she admitted that only Gennari-associated people would have opened the boxes as the allegedly offending boxes pictured in exhibits Nos. 5 through 8 were. (Gennari Dep. at 148, 152-54; Exs. 5-8.)

{¶ 31} There was also evidence from other sources. For example, Izworski testified that she observed a Gennari label on the boxes that she recognized products from vendors that Gennari represented in the contents, and that there were approximately 14 boxes she had to clear away to make room for the rescue squad. (Izworski Dep. at 19-20, 30, 65-75.) Wilson testified that she was able to see that the boxes contained sample books and that most of the boxes seemed to be open. (Wilson Dep. at 33-35.) Izworski also testified that when she told the president of Midwest what had occurred his response was, "Damn it. We just had it inspected, and I told Gennaris [sic] that area had to be clear." (Izworski Dep. at 41.) Taking into consideration all the testimony and drawing all reasonable inferences in favor of Wild, we cannot say that no genuine issue of material fact remains and, when construing the evidence most strongly in favor of Wild, Gennari was entitled to summary judgment as a matter of law. Drawing all reasonable inferences in favor of Wild, one would properly infer that Gennari had been warned previously about obstructing the utility room because Gennari had been known to obstruct the utility room. Dakin, director of Midwest, also seemed to take it as established that Gennari was responsible for the obstructing boxes when she wrote to Kathy and Joe Gennari in the immediate aftermath of the accident and said, "We just need to get those boxes out of there please." (Ex. 22 at 3, Gennari Dep.) Moreover, Gennari's response to Dakin was not a denial. Her response instead was, "[W]e are responsible for the boxes being there, and I am so sorry." *Id.* at 2.

{¶ 32} Under the circumstances, there was ample evidence from which the trial court, drawing all reasonable inferences in favor of Wild, should have found a genuine issue of material fact about whether Gennari or agents of Gennari placed the boxes in the darkened room. Wild's second assignment of error is sustained.

## IV. CONCLUSION

{¶ 33} In our de novo review of the record, we hold that the trial court's summary judgments in favor of Midwest and Gennari were granted in error. In reviewing the evidence and in drawing all reasonable inferences therefrom in favor of Wild as required by Civ.R. 56, we do not find that either Midwest or Gennari was legally entitled to summary

judgment.  We sustain both of Wild's assignments of error and reverse the judgments of the trial court.

*Judgments reversed and remanded.*

KLATT and HORTON, JJ., concur.

————————————